UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

PANTHER PARTNERS, INC., on Behalf        :
of Itself and All Others Similarly Situated,
                                         :
                    Plaintiff,                          06 Civ. 12967 (PAC)
                                         :
            -against-
                                         :              <u>OPINION & ORDER</u>
IKANOS COMMUNICATIONS, INC.,
et al.,                                  :

                    Defendants.          :

-------------------------------------------------------X

    HONORABLE PAUL A. CROTTY, United States District Judge:

    Defendant Ikanos Communications, Inc. ("Ikanos" or the "Company"), and certain

individual officers and directors,[1] along with its underwriters, Citigroup Global Markets Inc. and

Lehman Brothers Inc., (collectively, the "Defendants"), move pursuant to the Private Securities

Litigation Reform Act of 1995 (the "PSLRA") and Federal Rules of Civil Procedure 8 and

12(b)(6) to dismiss the amended complaint filed by lead plaintiff Panther Partners ("Plaintiff" or

"Panther") in this class action securities suit. Panther alleges that Ikanos misstated or failed to

disclose a host of purportedly material facts, which allegedly existed at the time of either

Ikanos's Initial Public Offering ("IPO") in September 2005, or its Secondary Offering in March

2006.[2] Ikanos's stock performed well subsequent to the IPO and the Secondary Offering, but in

---

[1] The individual officers and directors are: Rajesh Vashist, Daniel K. Atler, Danial Faizullabhoy, Michael L.
Goguen, Michael Gulett, Paul G. Hanses, and Gopal Venkatesh.
[2] As an initial matter, Defendants also bring a standing challenge. They argue that Plaintiff failed to allege that it
acquired its shares through the IPO, and has not demonstrated that it was a "seller" in the Secondary Offering, and
therefore lacks standing to bring the claims. Defendant's Memorandum of Law in Support of its Motion for
Summary Judgment ("Def. Mem.") at 1, 13-15. At oral argument, however, Plaintiff's counsel assured the Court
that the standing defects could be cured. Transcript of Oral Argument ("Tr."), Jan. 16, 2008, at 22. In light of
counsel's averments, the Court is satisfied that the standing issues are curable and proceeds to reach the merits of the
motion.

1

Summer 2006, and continuing thereafter, it encountered several difficulties which had an adverse effect on its business and led to a decline in its stock price.

Following the market decline, Panther researched these subsequent events, apparently with an eye toward this litigation, and focused on four pieces of information which they now argue should have been disclosed at the time of the offering documents. Had the information been disclosed, Panther contends that the buying public would have better comprehended the nature of the Ikanos offerings, and more acutely understood the risks involved. The four pieces of information are:

(1) Ikanos's Japanese customers held inflated levels of Ikanos product in their inventory;

(2) Ikanos had faulty quality control processes;

(3) A latent defect, called "Kirkendall voiding," existed in a particular Ikanos semiconductor chip; and

(4) Ikanos acquired useless inventory as part of a much larger corporate acquisition.

It must be noted that none of these faulty nondisclosures involve financial information or the misrepresentation of financial data. Indeed, there is no challenge to Ikanos's argument that its financials for 2004 through 2006 were audited and received unqualified opinions. Here, the alleged failures deal with future business and technical conditions, events that were either unknown or unknowable at the time of the disclosures. Under these circumstances, Panther's allegation that Ikanos should have disclosed information that it did not (and could not) know must fail.

The purpose of registration statements is to provide accurate and meaningful material information so that investors can make informed decisions about whether or not to purchase stock in a particular offering, and to understand the risks inherent in the investment. See SEC v.

Ralston Purina Co., 346 U.S. 119, 124 (1953) (explaining that the purpose of the registration requirements of the Securities Act of 1933 "is to protect investors by promoting full disclosure of information thought necessary to informed investment decisions.") In its offering statements, Ikanos made specific disclosures about the risks inherent in the semiconductor market, the Company's business model, the Company's design and production processes, and the integration of newly acquired technology. Those disclosures were more than adequate. They are of sufficient precision and clarity to alert prudent investors to the nature of the offerings and the risks entailed. The securities laws do not require clairvoyance in the preparation of offering documents;[3] these documents are not guarantees of an offering's subsequent success, nor do they insure investors against the vicissitudes of technology and industry, nor the volatility of the stock market itself. See In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1420 (9th Cir. 1994) ("There are a number of risks involved whenever one invests in any company. . . . The securities laws do not insulate investors against stock downturns which are caused by events not foreseeable to the company's management, nor do they provide insurance against risks that were disclosed to investors at the time they purchased the securities." (quoting the District Court's decision, In re Worlds of Wonder Sec. Litig., 814 F.Supp. 850, 873 (N.D. Cal. 1993)). For these reasons and the reasons set forth below, Defendants' motions are granted and the amended class action complaint is dismissed.[4]

---

[3] See Steckman v. Hart Brewing, Inc., No. 96 Civ. 1077-K (JNK), 1996 WL 881659 at *2 (S.D. Cal. Dec. 24, 1996) (explaining that the securities laws do "not require the disclosure of forward-looking information anticipating a future trend.").

[4] Although the underwriters (represented by different counsel than Ikanos and the individual officers and directors) filed separate submissions on this motion to dismiss, they did not raise any legal arguments unique to their role in the offering. As a result, the Court treats all Defendants collectively for the remainder of this opinion.

**SUMMARY OF FACTS**

**A.  Background**

The Complaint alleges the following facts which, for the purposes of this motion, are taken to be true; all reasonable inferences are drawn in favor of Plaintiff, the non-moving party. <u>Bell Atl. Corp. v. Twombly</u>, --- U.S.---, 127 S.Ct. 1955, 1975 (2007).  Ikanos is a provider of programmable semiconductors which enable fiber-fast broadband services over telephone companies' existing copper lines.  (<u>See</u> Amended Complaint ("Am. Compl.") ¶ 25; Ikanos's IPO Prospectus, Sept. 22, 2005, Exhibit A ("Ex. A") at 1.)  Ikanos sells its products to original equipment manufacturers ("OEMs") who incorporate Ikanos components into their own communications products.  (Am. Compl. ¶ 26; Ex. A at 1.)  The OEM then assembles its product, containing the Ikanos component, and sells it to major telecommunications carriers.  As a result, the market for Ikanos products depends on the demand from OEMs, whose demand, in turn, is dictated by the needs of telecommunications companies faced with a multi-faceted and often unpredictable market.  The vast majority of Ikanos's sales are made to Japanese and Korean customers.  (Am. Compl. ¶ 27.)

Ikanos itself is a "fabless" company, meaning that it does not fabricate its own products.[5] This fact is prominently featured on the first page in the first paragraph of its IPO Prospectus. (Ex. A. at 1.)  Instead of relying on the in-house fabrication of its products for revenue, Ikanos designs and engineers its semiconductor chips, but "outsource[s] all of the manufacturing, assembly, and testing of . . . semiconductors to . . . outsourcing partners."  (Ex. A at 1.)  Once designed in-house, Ikanos contracts with overseas entities to produce the chips, and these overseas entities provide quality control testing of the chips.  (Ex. A at 1.)

---

[5] The TechEncyclopedia defines "fabless" as:  "A semiconductor vendor that does not have in[-]house manufacturing facilities.  Although it designs and tests the chips, it relies on external foundries (fabs) for their actual fabrication."  TechWeb Network, TechEncyclopedia, http://www.techweb.com/encyclopedia.

4

## B. The Offerings

Ikanos sold stock in two public offerings: an IPO on September 22, 2005, and a Secondary Offering on March 17, 2006. (Am. Compl. ¶ 20.)[6] It registered both offerings with the Securities and Exchange Commission, and the registration statements provided information about the company. While exceeding its financial expectations from the first quarter of 2005 (two quarters before the IPO) through the second quarter of 2006 (one quarter after the Secondary Offering), Ikanos experienced an 11% decline in revenue in the third quarter of 2006.[7] Panther alleges that the registration statements were deficient in that they failed to disclose the problems which ultimately caused the stock's downturn in the third quarter of 2006.

## C. The Allegations

Plaintiff contends that four particular pieces of information should have been disclosed under the mandates of the securities laws as part of the IPO or the Secondary Offering: (1) problems with excess inventory in the Japanese market, (2) deficiencies in Ikanos's quality control processes, (3) "Kirkendall voiding" defects in Ikanos's VDSL (very-high-bit-rate digital subscriber line) Version Four Chip, and (4) potential write-offs in relation to the acquisition of network processing technology from Analog Devices, Inc. (the "NPA Acquisition"). (Am. Compl. ¶¶ 31-41, 47-62.)

---

[6] The IPO resulted in the sale of more than 6.4 million shares of Ikanos common stock for $12 per share, yielding over $67 million. The Secondary Offering resulted in the sale of more than 5.75 million shares of common stock for $20 per share, yielding over $120 million. In addition, individually named Defendants Vashist, Atler, Hanse and Venkatesh—all officers or directors of Ikanos—sold more than 350,000 of their personally-held shares in the Secondary Offering, for proceeds of more than $7 million. (Am. Compl. ¶¶ 28-29, 43-45.)

[7] The price of Ikanos common stock dropped from $13.85 per share on July 31, 2006, to $10.24 per share on August 2, 2006, following an announcement regarding the write-off of inventory related to the NPA Acquisition. (See Am. Compl. ¶¶ 63-64; discussion infra Part III(4).) Subsequently, on October 4, 2006, Ikanos announced its results for the quarter ended on September 30, 2006; it missed its projection of $40 to $43 million in revenue for that quarter, and reported revenue of between $36 and $37 million. In response to this announcement, the stock price declined from $10.94 per share to $7.76 per share. As of the close of trading on January 15, 2008, Ikanos stock was priced at $4.95 per share.

In connection with the IPO, Plaintiff asserts that despite strong ordering from Japanese customers between 2003 and 2005, Ikanos knew that Japanese orders would be reduced going forward due to over-stocked inventories, but that Ikanos failed to disclose this fact in its registration statement. (Am. Compl. ¶ 34.) Plaintiff also contends that Ikanos knew that it had an inadequate quality assurance program at the time of the IPO, but failed to disclose this deficiency in its filings. (Am. Compl. ¶ 35.) With respect to the Secondary Offering, Plaintiff alleges that Ikanos failed to disclose information about problems with the VDSL Version Four Chip, problems which Plaintiff contends emerged in January 2006 (two months before the Secondary Offering in March) and therefore should have been revealed. (Am. Compl. ¶ 47.) Finally, Plaintiff contends that the failure to disclose the acquisition of potentially obsolete inventory in conjunction with the purchase of NPA is actionable under the securities laws. (Am. Compl. ¶ 56.)

### D. The Parties' Arguments

Plaintiff argues that even though Ikanos was aware of all of these deficiencies at the time of either the IPO or Secondary Offering, Ikanos did not disclose them as mandated by the federal securities regulations. (Am. Compl. ¶ 31-62.) Further, Plaintiff asserts that the ultimate disclosure of the information surrounding these purported deficiencies, and the direct impacts of the deficiencies themselves, prompted the 11% decline in Ikanos's value in the third quarter of 2006, a decline which Panther contends is actionable under the securities laws. (Am. Compl. ¶¶ 63-66.)

In response to these allegations, Defendants point to the successful performance of the Company in the nine months following the IPO and the four months following the Secondary Offering, during which time Ikanos exceeded financial expectations. (Def. Mem. at 9.) They

also highlight the fact that the Company's independent, outside auditors issued unqualified audit opinions for 2004, 2005, and 2006, indicating that no financial misconduct occurred during the period in question. (Def. Mem. at 1-3.) Defendants further opine that making the requested disclosures at the time of the offerings would have amounted to nothing more than revealing internal forecasts, projections, and trend analyses, the disclosure of which is not required under securities regulations. (See Def. Memo at 2.) Finally, Defendants contend that they complied with the securities laws in all ways because Ikanos warned of the exact risks later realized, that its statements are protected by both the PSLRA's safe harbor and the "bespeaks caution" doctrine, and that any other optimistic forward-looking statements which might provide the basis for this action amount to mere puffery. (Def. Memo at 2.)

This action was filed in November 2006 and consolidated with similar cases in January 2007. The Plaintiff seeks remedies pursuant to the Securities Act of 1933, Sections 11 and 12(a)(2).[8] 15 U.S.C. §§77k, 77l(a)(2) (2007).

## DISCUSSION

## I. Pleading Requirements and the Twombly Standard

On a motion to dismiss, the court must "accept as true all of the factual allegations contained in the complaint," and construe the complaint in the light most favorable to the plaintiff. Twombly, 127 S.Ct. at 1975 (citation omitted). But mere "formulaic recitation of a cause of action's elements" will not suffice; instead, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 1965. To survive a motion to dismiss,

---

[8] Plaintiff also seeks remedies against the individual officers and directors of the company pursuant to Section 15 of the Act which addresses liability against control persons. See 15 U.S.C. § 77o. Those claims, however, are predicated on the success of the underlying Section 11 and Section 12 claims, and because those underlying claims are dismissed, the Section 15 claims fail as a matter of law. See In re Scottish Re Group Sec. Litig., 524 F. Supp. 2d 370, 387 (S.D.N.Y. 2007) (explaining that a finding of individual liability under Section 15 requires a predicate "primary violation" of the securities laws).

courts require "enough facts to state a claim to relief that is plausible on its face."  Id. at 1974;

see also Iqbal v. Hasty, 490 F.3d 143, 157-158 (2d Cir. 2007) (a plaintiff must "amplify a claim

with some factual allegations in those contexts where such amplification is needed to render the

claim plausible.").  Plaintiff must therefore allege "plausible grounds to infer" that its claims of

misstatement or omission rise "above the speculative level."  Twombly, 127 S.Ct. at 1965.

## II.  Sections 11 and 12(a)(2) of the Securities Act of 1933.

The Securities Act of 1933 (the "Act") "was designed to provide investors with full

disclosure of material information concerning public offerings of securities in commerce, to

protect investors against fraud and, through the imposition of specified civil liabilities, to

promote ethical standards of honesty and fair dealing."  Ernst & Ernst v. Hochfelder, 425 U.S.

185, 195 (1976) (citing H.R. Rep. No. 85, 73d Cong., 1st Sess., 1-5 (1933)).  Sections 11 and 12

of the Act "give effect to the basic purpose underlying the Securities Act—full disclosure to

investors of pertinent information concerning the issuers of securities and the securities

themselves—by imposing strict liability for material misinformation contained in a registration

statement or prospectus."  In re Unicapital Corp. Sec. Litig., 149 F. Supp. 2d 1353, 1363 (S.D.

Fla. 2001).

### A. Section 11

Section 11 of the Act imposes civil liability for materially misleading registration

statements.  Section 11 provides that:

> [i]n case any part of the registration statement, when such part became effective,
> contained an untrue statement of a material fact or omitted to state a material fact
> required to be stated therein or necessary to make the statements therein not misleading,
> any person acquiring such security . . . [may] sue . . . every person who signed the
> registration statement . . . [and] every underwriter with respect to such security.[9]

---

[9] Therefore, liability for misstatements extends to, among others, underwriters of securities and to anyone who
consented to be "named as having prepared or certified [a] report or valuation which is used in connection with the
registration statement." 15 U.S.C. § 77k.  Liability on the part of the underwriter defendants is tethered to their duty

15 U.S.C. § 77k(a).  A successful section 11 claim meets two requirements: (1) the defendant has an affirmative duty to disclose the information but fails to do so, and, (2) the untrue or omitted information was material.  <u>Milman v. Box Hill Sys. Corp.</u>, 72 F. Supp. 2d 220, 227 (S.D.N.Y. 1999).  Materiality alone does not demand disclosure, nor does the duty to disclose encompass non-material information.

Whether a duty to disclose exists depends largely on the itemized disclosures required by the securities laws and the regulations promulgated thereunder (<u>see</u> <u>infra</u> Part II.C below).  Materiality is a separate matter; "[i]n assessing whether a misrepresentation or omission was material, courts may not employ 20/20 hindsight; instead, they must consider whether the misrepresentation or omission was material on the date the prospectus or registration statement was issued."  <u>In re Unicapital</u>, 149 F. Supp. 2d at 1363.  While materiality is generally a question reserved for the fact-finder, dismissal as a matter of law is proper "if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality."  <u>Id.</u> (quoting <u>Weiner v. Quaker Oats Co.</u>, 129 F.3d 310, 317 (3d Cir. 1997)); <u>see also</u> <u>In re Twinlab Corp. Sec. Litig.</u>, 103 F. Supp. 2d 193, 201 (E.D.N.Y. 2000).

**B. Section 12**

Section 12(a)(2) of the Securities Act imposes liability on any person who offers or sells securities by means of a prospectus "which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the

---

to conduct due diligence on the offering company.  In this way, Section 11 "was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing stringent standards of liability on the parties who play a direct role in the registered offering."  <u>In re Prestige Brands Holding, Inc.</u>, No. 05 Civ. 06924 (CLB), 2006 WL 2147719, at *7 (S.D.N.Y. July 10, 2006) (citation omitted).

circumstances under which they were made, not misleading." 15 U.S.C. § 77l; see also Yung v. Lee, 432 F.3d 142, 147 (2d Cir. 2005).

A misstatement under Section 11 or Section 12(a)(2) is established when "material facts have been omitted or presented in such a way as to obscure or distort their significance." I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., 936 F.2d 759, 761 (2d Cir. 1991) (quotations and citation omitted). But it is undisputed that "accurate statements of historical fact and statements of opinion," including statements of "hope, opinion, or belief about . . . future performance or general market conditions" are non-actionable. In re Initial Pub. Offering Sec. Litig., 358 F. Supp. 2d 189, 210 (S.D.N.Y. 2004) ("The disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." (quoting In re Sofamar Danek Group, Inc., 123 F.3d 394, 401 n.3 (6th Cir. 1997)). Moreover, unlike claims under other sections of the Securities Act, Sections 11 and 12(a)(2) do not require a plaintiff to allege scienter or other elements of fraud. Rombach v. Chang, 355 F.3d 164, 169 n.4 (2d Cir. 2004).

### C. Regulation S-K, Items 303 and 503

Section 17, Part 229 of the Code of Federal Regulations, also known as "Regulation S-K," provides standard instructions for filing forms under the Securities Act of 1933. It gives rise to specific duties to disclose, and provides detailed guidance about the items to be disclosed, and the nature and specificity required of each disclosure. Item 303 of Regulation S-K provides a list of mandated disclosures. The issuer is required to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii) (emphasis added). Item 503 of Regulation S-K, in

turn, covers the disclosure of risk. It requires an issuer to include in its disclosures "a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c) (emphasis added). Failure to make the requisite disclosures under Regulation S-K will generally produce liability under the Securities Act. See In re Initial Pub. Offering, 358 F. Supp. 2d at 211.

### D. The PSLRA Safe Harbor & The "Bespeaks Caution" Doctrine

Occasionally, an offering party includes as part of its registration documents certain forward-looking statements which provide indications about the future prospects of the company. When a party makes these statements in conjunction with the offering and these statements turn out to be inaccurate such that they might, in hindsight, constitute "misstatements" or "omissions," those statements may still be insulated from liability under the securities laws. There exists both a statutory "safe harbor" for these statements and a judicially-created defense to liability, the so-called "bespeaks caution" doctrine. 15 U.S.C. § 78u-5; In re Prudential Sec. Inc. Ltd. P'ships Litig., 930 F. Supp. 68, 71-72 (S.D.N.Y. 1996). The safe harbor serves to protect projections that are clearly identified as forward-looking and are "accompanied by meaningful cautionary statements and specific warnings of the risks involved." In re Unicapital, 149 F. Supp. 2d at 1373 (quoting Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1276 n. 7 (11th Cir. 1999)). The bespeaks caution doctrine "allows courts to rule that a defendant's forward-looking representations contain enough cautionary language or risk disclosures to protect against claims of securities fraud." In re Prudential, 930 F. Supp. at 71. The bespeaks caution doctrine is not without limits, however, and "[g]eneral risk disclosures in the face of specific known risks which border on certainties do not bespeak

caution." Id. at 72.  Instead, risk disclosures must accurately characterize the scope and specificity of the risk, as understood at the time the statements are made.  See id.

## III. Analysis

In this case, Plaintiff alleges that Ikanos either failed to disclose or materially misstated four key pieces of information at the time of the IPO or the secondary offering.  A close inspection of the pleadings, however, reveals that the allegations have been craftily drafted to imply that what only became clear due to subsequent events was somehow known to Ikanos far earlier in time, well before the confirming event occurred or other evidence came to light.  This is pleading with 20/20 hindsight.  The law is clear that what must be disclosed are material "known trends" or "uncertainties," or the "most significant" risk factors with respect to an offering, which are known to the offering company at the time the registration statements are made.  17 C.F.R. §§ 229.303 and 229.503.  The critical inquiry for the Court, then, is whether—and to what extent—Ikanos was aware of the issues and their potential impacts at the time of the offering statements.  To the extent that Ikanos knew of the issues and, more importantly, considered them to be material within the meaning of the securities regulations at the time of the offering, they should have been disclosed.  If Ikanos was either unaware of the problems, or if the problems did not meet the materiality threshold, however, then no disclosure was required and Ikanos is not liable in conjunction with its offering statements.

Here, the allegations have been "reverse-engineered" to attempt to state a claim, but the suit must fail.  Plaintiff's allegations are inadequately pleaded.  The allegations with regard to what Ikanos knew, and when they knew it, lack the specificity and detail needed to rise above the "speculative" level and into the realm of a "plausible" pleading.  Twombly, 127 S. Ct. at 1965.

**(1) The Japanese Inventory**

Plaintiff first contends that prior to the IPO, Ikanos shipped large amounts of product to its Japanese customers, who comprise a significant section of its market. (Am. Compl. ¶ 31.) As a result of this allegedly excessive shipping prior to the IPO, Plaintiff asserts that Ikanos's Japanese customers developed a backlog of inventory which inevitably led to a significant reduction in orders following the IPO. (Am. Compl. ¶ 31.) In light of the reduced demand, Plaintiff asserts that Ikanos made untrue statements of material fact with regard to the Japanese market when it stated in conjunction with the IPO that, "[o]ver the last two years, we have experienced significant net revenue growth, primarily due to a rapid rise in deployments of our products in Japan and Korea." (Am. Compl. ¶ 32; Ex. A at 30.)

In response, Defendants contend that this statement constituted the disclosure of a historical fact that cannot provide the basis for liability under the securities laws. (Def. Mem. at 17 (citing in re Initial Pub. Offering, 358 F. Supp. 2d at 210).) Defendants insist that Ikanos had, in fact, experienced significant growth as a result of increased shipments to Japan, and that a wholly accurate statement to that effect—even when unaccompanied by further statements indicating that demand might somehow decrease in the future—is simply not actionable. Id.

Panther's position with regard to the Japanese inventory cannot withstand examination. Simply stated, Panther alleges that the increased ordering from Japanese customers in 2003 and 2004 would somehow inevitably lead to a decrease in ordering in 2006, and that Ikanos should have known that. Panther cannot explain, however, why or how the Defendant should have known this information. There is no duty to track customers' inventory or to advise customers that they are ordering too much product and should cut back (both propositions are preposterous). Absent those duties, the Court finds no basis in the pleadings to find that Ikanos

knew, or should have known, of the status of Japanese inventory of Ikanos products. Defendants are not expected to know the un-knowable, nor are they expected to disclose it.

Furthermore, the uncontroverted sales data for the four successive quarters following the IPO in September 2005 shows that Ikanos's performance exceeded financial expectations. Panther does not allege any reasoned basis on which Ikanos—in light of improving financial performance—should have been aware that Japanese orders would decline. Finally, and fatally for Panther's claim, the risk disclosures made were more than adequate to warn investors of the possibility of future downturn in the market. Ikanos directly stated in its Prospectus that:

> The semiconductor industry is highly cyclical and subject to rapid change and evolving industry standards and, from time to time, has experienced significant downturns. These downturns are characterized by decreases in product demand . . . [and] <u>excess customer inventories</u> . . . . These factors could cause substantial fluctuations in our net revenue and in our operating results.

(Ex. A. at 17.) This statement clearly identifies the risk later realized. Panther has not adequately pleaded sufficient facts with regard to the Japanese inventory, and its position is completely untenable; the claim must be dismissed.

### (2) Lack of an Adequate Quality Assurance Program

Plaintiff next argues that Ikanos failed to maintain an adequate quality assurance program, that the absence of such a program exposed the Company to heightened risk going forward (risk that would later manifest itself in the form of a chip defect),[10] and that Ikanos should have disclosed this alleged deficiency in its offering documents at the time of the IPO. (Am. Compl. ¶¶ 35-37.) Plaintiff claims that the Company made untrue statements of material fact when it disclosed that:

> Our quality assurance program begins with the design and development process. Our designs are subjected to extensive circuit simulation under extreme conditions of temperature, voltage and processing before being committed to manufacture.

---

[10] <u>See</u> discussion <u>infra</u> Part III(3) below.

(Am. Compl. ¶ 40.)

Panther's allegations with respect to quality control do not pass muster for three reasons. First, to the extent that the statement accurately describes Ikanos's program—and the fact that its quality assurance program was limited to testing its <u>designs</u> (and not the actual chips)—it is non-actionable. <u>See</u> <u>In re Initial Public Offering</u>, 358 F. Supp. 2d at 210. Second, Plaintiff's unsupported claims that "Ikanos was under-funding its research and design operations as well as its quality control operations" fail to meet the threshold pleading requirements of <u>Twombly</u>. (Am. Compl. ¶ 36.) Plaintiff does not allege any facts which indicate that Ikanos knew, or should have known, that its quality assurance program was defective at the time of the IPO in September 2005. Indeed, the only defect Plaintiff identifies did not manifest itself until, at the earliest, January 2006—four months after the IPO. Since there was no actual problem with quality control, Panther is reduced to alleging that Ikanos failed to provide adequate resources for its quality control program, but Panther's allegations provide no hint of what would constitute an "adequately resourced" quality control program. Certainly an "adequate" quality control program does not mean zero defects, and whatever other deficiencies might be alleged about Ikanos's program, the allegations surely do not do not constitute "known trends," "uncertainties," or "significant risk factors" which require disclosure. Finally, aside from the inadequacy of Panther's pleadings and its failure to enumerate exactly how and why Ikanos's quality control program was under-staffed and under-funded, Ikanos discussed and fully disclosed the exact nature of its quality assurance program and the precise risks inherent in its model. With respect to its quality assurance program, Ikanos's registration statements show that it was a fabless company which outsourced production and quality control to subcontractors overseas. The Prospectus stated:

We are a fabless semiconductor company in that we do not own or operate a fabrication or manufacturing facility. Five outside factory subcontractors located in Taiwan, Austria, Malaysia and Singapore manufacture, assemble and <u>test all of our semiconductor devices</u> . . . . [W]e have experienced . . . delays due to technical and <u>quality control problems</u> at our subcontractors' facilities. . . . In addition, manufacturing <u>defects may not be detected</u> by the testing process performed by our subcontractors. <u>If defects are discovered</u> after we have shipped our products, our reputation would be harmed and <u>our net revenue and operating income could decline</u>.

(Ex. A at 8-9 (emphasis added).)

Again, Panther is engaging in retrospective pleading; it questions the accuracy of the offering statement in light of the much-later materialization of a quality control problem. Of all of Plaintiff's allegations, this one is most clearly a case of "pleading by hindsight." Panther alleges that in January 2006 Ikanos became aware that some chips were failing (which, by itself, is not unusual).[11] It is obvious, of course, that a defect problem which does not emerge until January 2006 (at the earliest) cannot be disclosed in September 2005. An earlier statement is not somehow made misleading simply because it failed to foretell a defect problem which later materialized. Panther's allegation that Ikanos failed to disclose that it lacked an adequate in-house quality assurance program flies in the face of the disclosure actually made: Ikanos's disclosure covers the exact risk later realized, namely, the potential manifestation of a quality control problem at the site of its subcontractor's overseas production plant. An accurate statement coupled with the precise disclosure of a risk later realized cannot adequately form the basis for a securities claim. <u>See</u> <u>In re Initial Public Offering</u>, 358 F. Supp. 2d at 210. Plaintiff's attempts to plead this allegation by hindsight are unavailing and the claim is dismissed.

### (3) VDSL Chip Defects

Panther alleges that defects in Ikanos's VDSL Version Four Chip should have been disclosed as of the time of the Secondary Offering in March 2006. According to the pleadings,

---

[11] <u>See</u> discussion <u>infra</u> Part III(3) below. The pleadings also reveal that it was not until Summer 2006 that a large-scale systemic defect appeared.

Ikanos was aware that the chips were defective and were causing problems in systems where they were employed as early as January 2006.[12]  Indeed, according to Plaintiff, the chips ultimately failed in 25 to 30% of cases, and were returned to Ikanos by customers.  (Compl. ¶ 51.)  Ikanos, in turn, was not only forced to write-off the cost of the defective chips, but to replace them at additional cost to itself, and at no cost to customers. (Am. Compl. ¶ 52.)

Panther contends that this is the strongest of all its claims,[13] but it, too, must fail.  It is undisputed that what must be disclosed under Item 303 of Regulation S-K is something that is a "known trend" or "uncertainty" that the offering party expects will have a "material" impact on the business.  17 C.F.R. § 229.303(a)(3)(ii).  That requisite "knowledge" during the time period in question is clearly absent here.  According to the Amended Complaint, while Ikanos was purportedly "aware" of the defect problem in January 2006, the large volume of replacement chip shipments did not occur until June 2006 (the second fiscal quarter) through October 2006 (the fourth fiscal quarter) (Am. Compl. ¶ 52).  Thus the question is whether Ikanos knew or should reasonably have known about the so-called material "trend" as of the date of the Secondary Offering in March 2006 (the first fiscal quarter).  It is significant that all of the allegations in the Amended Complaint of "awareness" (Am. Compl. ¶ 47) or "learning" (Am. Compl. ¶ 48) of chip failures (Am. Compl. ¶ 49) specify January 2006, as the critical date, but

---

[12] The chips developed a problem called "Kirkendall voiding," which occurs when an alloy and a metal are bonded together.  See Hideo Nakajima, The Discovery and Acceptance of the Kirkendall Effect: The Result of a Short Research Career, JOM: A Publication of the Minerals, Metals and Materials Society, Vol. 49, No. 6 (1997) at 15-19, available at: http://www.tms.org/pubs/journals/JOM/9706/Nakajima-9706.html.  Atomic diffusion occurs when alloys and metals bond and the atoms migrate toward the alloy, causing problems with the bonded connection.  Id.  The Ikanos chip had a gold wire bonded to an aluminum pad, which resulted in the migration of the atoms and the failure of the chips. (Compl. ¶¶ 47-51.)  Identification of the problem can be difficult because the rate of migration and emergence of the problem are affected by time and temperature.  Solid atomic diffusion takes longer than gaseous or liquid diffusion, so the problem does not become immediately apparent.  In addition, the problem is worsened by increased temperatures.  Therefore, to the extent that the Ikanos chips were deployed over time to various locations and uses, identifying the problem could be difficult.  Plaintiff alleges, however, that Ikanos was aware of the problem in January 2006.  (Compl. ¶ 49.)

[13] See Tr. at 28 (Plaintiff's counsel: "I want to turn to what I think is clearly the strongest claim in the case, and that is the problems [sic] with the version 4 chip.").

are silent about the rate at which chips were being returned as of that date, or the volume of the defect at that time.  Nor do the allegations specify that Ikanos knew exactly what the particular defect was at that time.  It is no secret that chips are subject to some percentage of failure (and here there is no pleading as to what a "normal" defect rate is), so the allegation that "there were defects" is meaningless without more.  Certainly the failure to disclose that there was a defect does not amount to a basis for liability under the securities laws.  To state a plausible claim under the <u>Twombly</u> standard, further context must be provided about these chip defect allegations.  The Plaintiff must tell the Court what was going on when—and how much the defect experienced actually differed from the norm.  This is especially true where, as here, the nature of the allegation is an exercise in "backwards" pleading—an attempt to allege liability for disclosures not made because the material fact was unknowable or had not even occurred as of the critical date.  No plausibly pleaded fact suggests that Ikanos knew or should have known of the scope or magnitude of the defect problem at the time of the Secondary Offering.  Plaintiff asks the Court to assume that Defendants <u>must</u> have known because something did in fact occur later; this is simply inadequate pleading.

The securities laws do not require the disclosure of the future possibility of a Kirkendall voiding defect on a semiconductor chip.  What is required is a fair and adequate disclosure of the risks inherent in the semiconductor chip industry, and any significant risks already materialized, so that investors can make informed decisions.  Given the risk disclosures actually made, it is clear that Ikanos sufficiently notified the reasonable investor that it was not a defect-free company.  There is more than adequate disclosure of the possible snags these chips could encounter.  Ikanos warned of the risk of defectiveness as part of its Item 503 disclosures.  It stated:

> Highly complex products such as those we offer <u>frequently contain defects and bugs</u>, particularly when they are <u>first introduced</u> or as <u>new versions</u> are released. In the past <u>we have experienced</u>, <u>and may in the future experience</u>, <u>defects and bugs in our products</u>. <u>If any of our products contains defects or bugs</u>, or have reliability, quality, or compatibility problems, our reputation may be damaged and our <u>OEM customers may be reluctant to buy our products</u>, which could harm our ability to retain existing customers and attract new customers. In addition, these <u>defects or bugs could interrupt or delay sales</u> or shipment of our products to our customers.

(Ex. B. at 20.) While the Court fully accepts Judge Pollack's test for "bespeaking caution"—that is, "[g]eneral risk disclosures in the face of specific known risks which border on certainties do not bespeak caution,"—as applied here, the risk disclosures made were sufficient. <u>In Re Prudential</u>, 930 F. Supp. at 72. The claim is dismissed.

### (4) NPA Acquisition

Finally, Plaintiff contends that Ikanos erred when it failed to disclose the possibility that it might acquire non-saleable inventory as part of an acquisition of certain networking technology devices, the so-called "NPA Acquisition." The Amended Complaint alleges that "[b]y the time of the Secondary Offering, Ikanos was carrying $700,000 of inventory acquired in the NPA Acquisition which was outdated, virtually obsolete, and un-saleable and would have to be written off." (Am. Compl. ¶ 56.) Ikanos's purported failure to disclose this fact is said to violate the securities laws.

Again, however, what the securities laws require is disclosure of "known trends" or "uncertainties," or the "most significant" risk factors which make an offering risky or speculative. 17 C.F.R. §§ 229.303 and 229.503. Plaintiff's allegations with regard to the NPA Acquisition and its associated write-off do not rise to this level. The acquisition of potentially obsolete inventory constituting, at the very most, a $700,000 write-off within a $30 million dollar acquisition, is immaterial. The absence of materiality is further demonstrated when Panther suggests that the potential $700,000 write-off be disclosed in the context of a $125

million dollar offering.  By any standard, the vague possibility that the company might have to write-off this inventory fails to reach the level of significance or materiality.  It is "so obviously unimportant to an investor that reasonable minds cannot differ" on the question of whether it was required to be disclosed.  In re Unicapital, 149 F. Supp. 2d at 1363 (quotation and citations omitted).   Accordingly, the claim is dismissed.

## CONCLUSION

For the reasons set forth above, the motions to dismiss filed by Defendant Ikanos, its individual officers and directors, and the underwriters of the securities offerings, are GRANTED. The Clerk of Court is directed to terminate all pending motions and close this case.


Dated: New York, New York
       March 10, 2008

                                        SO ORDERED


                                        _____
                                        PAUL A. CROTTY
                                        United States District Judge

million dollar offering. By any standard, the vague possibility that the company might have to write-off this inventory fails to reach the level of significance or materiality. It is "so obviously unimportant to an investor that reasonable minds cannot differ" on the question of whether it was required to be disclosed. In re Unicapital, 149 F. Supp. 2d at 1363 (quotation and citations omitted). Accordingly, the claim is dismissed.

## CONCLUSION

For the reasons set forth above, the motions to dismiss filed by Defendant Ikanos, its individual officers and directors, and the underwriters of the securities offerings, are GRANTED. The Clerk of Court is directed to terminate all pending motions and close this case.

Dated: New York, New York
March 10, 2008

SO ORDERED

PAUL A. CROTTY
United States District Judge